1

2

3

4    IN THE UNITED STATES DISTRICT COURT

5    FOR THE DISTRICT OF ARIZONA

6

7    RICHARD FARRALL,                    )
                                         )
8              Petitioner,               )     No. CV-04-0260-PHX-EHC (BPV)
                                         )
9    vs.                                 )
                                         )     **REPORT AND RECOMMENDATION**
10   DORA SCHRIRO, ET AL.,               )
                                         )
11             Respondents.              )
     _____)

12

13        On February 4, 2004, Richard Farrall, ("Petitioner"), an inmate confined by the

14   State of Arizona, filed a *pro se* Petition for Writ of Habeas Corpus by a Person in State

15   Custody, pursuant to Title 28, U.S.C. § 2254 ("Petition").  Named as Respondent in the

16   Petition is Dora B. Schriro.  The Attorney General of the State of Arizona is named as

17   an additional Respondent.  Respondents filed an Answer to the Petition on June 3,

18   2004, limited to the affirmative defense of time bar.

19        The District Court adopted the Magistrate Judge's recommendation finding the

20   Petition untimely under the AEDPA.  Petitioner appealed the order and the Ninth

21   Circuit Court of Appeals reversed and remanded, noting that after the appeal was

22   briefed, the Ninth Circuit had held, in *Summers v. Schriro*, 481 F.3d 710 (9th Cir. 2007),

23   that the one-year statute of limitations does not begin to run until 90 days after the

24   Arizona Supreme Court denies a petition for review of Rule 32-of right proceedings.

25   Accordingly, the Ninth Circuit held that the petition was timely filed and remanded for

26   review on the merits.  (Doc. No. 35.)

27        The District Court appointed counsel and a status conference was held on March

28   3, 2008.  (Doc. No. 48.)  At the status conference, Petitioner, through counsel, informed

the Court that he was prepared to request an evidentiary hearing to allow the Court to assess the credibility of witnesses with exculpatory evidence suggesting Petitioner's innocence. (Doc. No. 50, Reporter's Transcript ("RT"), 3/3/08, at 4-5.)

Respondents informed the Court that they had not yet addressed the merits of the petition. (*Id.*, at 6.) The District Court acknowledged Respondents' argument, and noted that this might come up at the hearing, which, in any event, Petitioner would be entitled to if he provided appropriate notice. (*Id.*)

Thereafter, Petitioner filed a "Motion for Evidentiary Hearing." (Doc. No. 52.) Respondents have filed a response opposing the motion, (Doc. No. 58), and Petitioner submitted his reply (Doc. No. 59). Respondents separately filed a Supplemental Answer. (Doc. No. 57.) Pursuant to the Rules of Practice of this Court, this matter was referred to Magistrate Judge Bernardo P. Velasco for a Report and Recommendation. An evidentiary hearing was held before Magistrate Judge Velasco on September 22-23, 2009.

The Magistrate Judge recommends that the District Court, after its independent review of the record, enter an order dismissing the Petition in its entirety.

## I. STATE COURT PROCEEDINGS

### A. Trial Court Proceedings

Petitioner was indicted on thirteen sexual conduct counts for crimes committed against Petitioner's minor step-daughters. (E.H. Ex[1]. 57.) On August 26, 1999, during a settlement conference with the trial court, Petitioner entered into two plea agreements with the State, agreeing to plead no contest to one count of sexual conduct with a minor under the age of 15, and to one count of attempted sexual conduct with a minor over the

---

[1] "E.H. Ex." refers to the Exhibits submitted at the Evidentiary Hearing.

age of 15.  (E.H. Exs. 58, 59.)  The plea agreements were accepted by the trial court at that same time.  (E.H. Ex. 54.)

On September 24, 1999, the Court heard, and denied, Petitioner's *pro se* motion to withdraw from the plea agreements.  (E.H. Ex. 55.)  On the date of sentencing, November 23, 1999, Petitioner again attempted to withdraw from the pleas, and was again denied by the trial court.  (E.H. Ex. 56.)  Petitioner was sentenced on that date to an aggravated term of 25 years on one count and a consecutive term of lifetime probation on the other.  (*Id.*)

B.    Post Conviction Relief Proceedings

On April 30, 2001, Petitioner filed a *pro se* "Petition for Post Conviction Relief." (Doc. No. 62, Ex. 5.)  The trial court denied Petitioner's motion, stating:

> The State's response correctly argues that none of the Defendant's claims is supported by any competent evidence.  Defendant offers nothing but conclusory allegations.   His plea of no contest waived all non-jurisdictional defenses.  No colorable claims are raised.

(Doc. No. 62, Ex. 6, Attachment One.)

Petitioner filed a petition for review on October 10, 2001.  (Doc. No. 62, Ex. 6.) The petition raised the following claims:

1.    [Petitioner] was coerced and intimidated into accepting his plea agreement and therefore the plea was not entered into knowingly and willingly by [Petitioner].

2.    The constitutional right to representation by a competent lawyer at every critical state of the proceedings was denied.

3.    Use of the State of perjured testimony which denied [Petitioner] his constitutional rights.

4.    [Petitioner's] rights against self-incrimination were unconstitutionally violated

| | |
|---|---|
| 1 | 5. The plea agreement is an illegal and void document having been changed |
| 2 | after [Petitioner] signed it. |
| 3 | 6. The State suppressed evidence that would have acquitted [Petitioner], |
| 4 | thus violating [Petitioner's] constitutional rights. |
| 5 | 7. The trial court improperly refused to resolve in favor of allowing |
| 6 | withdrawal of guilty plea which was requested shortly after [Petitioner] |
| 7 | signed the plea. |

8    (*Id*.)  The petition for review was summarily denied by the Arizona Court of Appeals
9    on August 30, 2002.  (Answer, Ex. N.)

10    A petition for review to the Arizona Supreme Court was filed on November 4,
11    2002.  (Doc. No. 62, Ex. 7.)  The claims were substantially similar to the claims raised
12    in the petition for review to the court of appeals.  (*Id*.)  The petition for review was
13    summarily denied on February 20, 2003.  (Answer, Ex. P.)

14    C.    <u>Federal Habeas Petition</u>

15    Petitioner filed a petition for habeas corpus in the District Court on February 4,
16    2004.  Petitioner asserts the following claims in his habeas petition:

17    Ground One:    Counsel coerced and intimidated Petitioner into accepting
18                   his plea agreements.

19    Ground Two:    He was denied his constitutional right to representation by
20                   a competent lawyer at every critical stage of the
21                   proceeding in violation of the Sixth Amendment.

22    Ground Three:  The plea agreements are illegal and void because of
23                   changes to the plea agreements made after Petitioner
24                   signed it.

25    Ground Four:   The State suppressed evidence that would have acquitted
26                   Petitioner, thus violating Petitioner's constitutional rights.

27    (Doc. No. 1)

28                                              - 4 -

## II. DISCUSSION

### A. Standard of Review

Because Petitioner filed his petition after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d) ("AEDPA").

### B. Exhaustion of State Remedies

Before a federal court may review a petitioner's claims on the merits, a petitioner must exhaust his state remedies, which means he must have presented in state court every claim raised in his federal habeas petition. *See Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (a state prisoner in a federal habeas action must exhaust his federal claims in the state courts "by invoking one complete round of the State's established appellate review process" before he may submit those claims in a federal habeas petition); *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999). Exhaustion of state remedies is required in order to give the state the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks and citations omitted). In order to provide a state with this necessary opportunity, "the prisoner must fairly present his claim in each appropriate state court . . . thereby alerting that court to the federal nature of the claim." *Id.* (internal quotation marks and citations omitted).

A claim is "fairly presented" if the petitioner has described the operative facts and legal theories on which his claim is based. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Tamalini v. Stewart*, 249 F.3d 895, 898 (9th Cir. 2001). In state court, the petitioner must describe not only the operative facts but also the asserted constitutional principle, for if "state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) ("If a habeas petitioner wishes to claim that an

evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."). A petitioner does not ordinarily "fairly present" a federal claim to a state court if that court must read beyond a petition, brief, or similar papers to find material that will alert it to the presence of a federal claim. *Baldwin*, 541 U.S. at 32-33 (rejecting contention that petition fairly presented federal ineffective assistance of counsel claim because "ineffective" is a term of art in Oregon that refers only to federal law claims, since petitioner failed to demonstrate that state law uses "ineffective assistance" as referring only to federal law rather than a similar state law claim); *Harless*, 459 U.S. at 6 (holding that mere presentation of facts necessary to support a federal claim, or presentation of state claim similar to federal claim, is insufficient; petitioner must fairly present the substance of the federal claim); *Hiivala v. Wood*, 195 F.3d 1098 (9th Cir. 1999) (holding that petitioner failed to exhaust federal due process issue in state court because petitioner presented claim in state court only on state grounds); *Gatlin v. Madding*, 189 F.3d 882 (9th Cir. 1999) (holding that petitioner failed to "fairly present" federal claim to state courts where he failed to identify the federal legal basis for his claim).

In Arizona, exhaustion is satisfied if a claim is presented to the Arizona Court of Appeals. A discretionary petition for review to the Supreme Court of Arizona is not necessary for purposes of federal exhaustion. *Swoopes*, 196 F.3d at 1010; *State v. Sandon*, 161 Ariz. 157, 777 P.2d 220 (1989) (in non-capital cases, state remedies are exhausted by review by the court of appeals); *Castillo v. McFadden*, 399 F.3d 993, 998 (9th Cir. 2005) (quoting *Swoopes* for assertion that in cases not carrying a life sentence or the death penalty, "claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them"). Contrary to Respondents' assertion, in Arizona, unless a prisoner has been sentenced to death, the "highest court" requirement is satisfied if the petitioner has presented his federal claim to the Arizona Court of Appeals either on direct appeal or in a petition for post-conviction relief. *See*

*Crowell v. Knowles*, 483 F.Supp.2d 925 (D.Ariz.2007)(discussing *Swoopes*, 196 F.3d at 1010).

The Ninth Circuit Court of Appeals has explained the distinction between exhaustion and procedural default as follows:

> The exhaustion requirement is distinct from the procedural default rule. The exhaustion doctrine applies when the state court has never been presented with an opportunity to consider a petitioner's claims and that opportunity may still be available to the petitioner under state law. In contrast, the procedural default rule barring consideration of a federal claim applies only when a state court has been presented with the federal claim, but declined to reach the issue for procedural reasons, or if it is clear that the state court would hold the claim procedurally barred. Thus, in some circumstances, a petitioner's failure to exhaust a federal claim in state court may *cause* a procedural default. A habeas petitioner who has defaulted his federal claims in state court meets the *technical* requirements for exhaustion; there are no state remedies any longer "available" to him. A federal claim that is defaulted in state court pursuant to an adequate and independent procedural bar may not be considered in federal court unless the petitioner demonstrates cause and prejudice for the default, or shows that a fundamental miscarriage of justice would result if the federal court refused to consider the claim.

*Cassett v. Stewart*, 406 F.3d 614, 621 n.5 (9th Cir. 2005) (internal quotation marks and citations omitted). In other words, a habeas petitioner's claims may be precluded from federal review in either of two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, the claim may be procedurally defaulted in federal court if the petitioner failed to present the claim in a necessary state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id*. at 735 n.1. This is often referred to as "technical" exhaustion, because although the claim was not actually exhausted in state court, the petitioner no longer has an available state remedy.

If a claim is procedurally defaulted, it may not be considered by a federal court unless the petitioner demonstrates cause and prejudice to excuse the default in state court, or demonstrates that a fundamental miscarriage of justice would result. *Id*. at 750;

*Sawyer v. Whitley*, 505 U.S. 333, 338-339 (1992). If a claim has never been fairly presented to the state court, a federal habeas court may determine whether state remedies remain available. *See Harris v. Reed*, 489 U.S. 255, 269-70 (1989); *Teague v. Lane*, 489 U.S. 288, 298-99 (1989); *White v. Lewis*, 874 F.2d 599, 602 (9th Cir. 1989).

Cause is defined as a "legitimate excuse for the default," and prejudice is defined as "actual harm resulting from the alleged constitutional violation." *Thomas v. Lewis*, 945 F.2d 1119, 1123 (9th Cir. 1991); *see Murray v. Carrier*, 477 U.S. 478, 488 (1986) (a showing of cause requires a petitioner to show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule"). Prejudice need not be addressed if a petitioner fails to show cause. *Thomas*, 945 F.2d at 1123 n.10. To bring himself within the narrow class of cases that implicate a fundamental miscarriage of justice, a petitioner "must come forward with sufficient proof of his actual innocence," *Sistrunk v. Armenakis*, 292 F.3d 669, 672-73 (9th Cir. 2002) (internal quotation marks and citations omitted), which can be shown when "a petitioner 'presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *Id.* at 673 (quoting *Schlup v. Delo*, 513 U.S. 298, 316 (1995)).

C.     Standard of Review: Merits

Petitioner's habeas claims are governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reduc[ing] delays in the execution of state and federal criminal sentences.' " *Schriro v. Landrigan*, 550 U.S. 465, 473, 475 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's " 'highly deferential standard for evaluating state-court rulings' ... demands that

- 8 -

state-court decisions be given the benefit of the doubt ." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh*, 521 U.S. at 333 n. 7).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1)     resulted in a decision that was contrary to, or involved an
>          unreasonable application of, clearly established Federal
>          law, as determined by the Supreme Court of the United
>          States; or
>
> (2)     resulted in a decision that was based on an unreasonable
>          determination of the facts in light of the evidence presented
>          in the State court proceeding.

28 U.S.C. § 2254(d).

The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (*citing Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient

- 9 -

legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 127 S.Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court cases] to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's

decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) ( *Miller-El II*).  A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).  In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Landrigan*, 550 U.S. at 473-474; *Miller-El II*, 545 U.S. at 240.  However, it is only the state court's factual findings, not its ultimate decision, that are subject to § 2254(e)(1)'s presumption of correctness.  *Miller-El I*, 537 U.S. at 341-42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale.  *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law.  *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167.  Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.  Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed de novo, because in that circumstance "there is no

state court decision on [the] issue to which to accord deference." *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012, 1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

> E.      Grounds One and Two (Ineffective Assistance of Counsel): Exhaustion

Petitioner asserts in Ground One of his federal habeas petition that counsel coerced and intimidated Petitioner into accepting his plea agreement. In Ground Two, Petitioner asserts that he was denied his constitutional right to representation by a competent lawyer at every critical stage of the proceeding in violation of the Sixth Amendment. The factual and legal basis for these two claims contain significant overlap, thus, the Magistrate Judge will consider the factual and legal basis for these two claims together.

Petitioner asserts in Ground One that, during the change of plea hearing, counsel threatened, coerced, and intimidated Petitioner into accepting the plea agreement, despite Petitioner's persistence in maintaining his innocence, and despite the recent acquisition of documents that would show prior inconsistent statements and allegations of abuse by the alleged victim and would prove Petitioner's innocence.

Petitioner asserts that he was left to "fend for himself" when he was heard on his motion to withdraw from his plea agreement. Petitioner also asserts that counsel refused to speak on behalf of Petitioner and belittled Petitioner in front of the court at the time of sentencing.

In Ground Two Petitioner asserts that after what he had experienced from his counsel's coercive and threatening behavior and by counsel's advice, he was "scared to death" in the courtroom and the decision to plead guilty was not of Petitioner's own doing.

Petitioner refined these claims in his motion for evidentiary hearing, filed by appointed counsel, to allege that:

1)  Trial counsel's deficient performance prior to and during the plea colloquy "impinged [his] ability to enter a knowing and voluntary plea." (Doc. No. 52, p.10) (quoting *Lambert v. Blodget*, 393 F.3d 943, 980 (9th Cir. 2004)).

2)  Petitioner's plea was involuntary on the grounds that his attorney improperly threatened, coerced, and intimidated him into accepting the plea.

3)  Petitioner's Sixth Amendment right to counsel was violated during the sentencing phase of trail by counsel's failure to present any mitigating evidence and by affirmatively undermining Petitioner's efforts to secure a lesser sentence.

4)  Judicial involvement in the plea colloquy was coercive, constituting a deprivation of due process.

5)  Trial counsel's refusal to assist Petitioner in preparing for or participating in the withdrawal of plea hearing constitutes a violation of the Sixth Amendment.

6)  The plea agreements signed by Petitioner are facially void on the grounds that: (a) the plea was changed after petitioner had signed the agreement; and (b) the plea was expired as of the date it was signed.

Grounds 1-3, and 5 presented in the motion for evidentiary hearing encompass Petitioner's claims found in Grounds One and Two of his petition, and will be considered as four subclaims of one ineffective assistance of counsel claim.

    **1.    Trial counsel's deficient performance prior to and during the plea colloquy impinged his ability to enter a knowing and voluntary plea.**

Petitioner claims that counsel urged Petitioner to plead no contest despite the existence of substantial evidence suggesting that Petitioner was, as he insisted, innocent

of the crimes with which he was charged. Petitioner further claims that the existence of this evidence raises significant doubt as to whether competent counsel would have urged Petitioner to accept the plea in question. Petitioner asserts that counsel's failure to discover significant exculpatory evidence prior to the plea colloquy is illustrative of representation that was inconsistent with the norms of the profession, and that Petitioner has sufficiently alleged prejudice so as to warrant a hearing by asserting that, but for counsel's failures, he would have insisted on going to trial. Petitioner had previously asserted in his state court proceedings that, prior to entering his plea, he "did not understand counsel's failure to pursue documents and records granted three days prior, which prove Defendant's innocence and disputes the validity of complainants allegations, showing prior recanting." (Doc. No. 62, Ex. 6, p. 11.)

The Magistrate Judge previously found that, construing Petitioner's habeas petition liberally, he had sufficiently raised the claim that his plea was involuntary, not simply because his counsel was coercive and intimidating, but because counsel's advice fell outside the range of competence demanded of attorney's in criminal cases. (Doc. No. 73)

Petitioner previously alleged, in his petition for review to the court of appeals (Doc. No. 62, Ex. 6), that, had it not been for counsel's ineffectiveness, Petitioner would have gone to trial. Petitioner alleged that there was no basis to convict him of the charges, and that the sole evidence in the State's case was the credibility of the complainant. (*Id.* at 9) Petitioner asserted that the credibility of complainant was in question and "this was known by defense counsel." (*Id.*) Petitioner stated that he did not understand counsel's failure to pursue documents and records granted three days prior, which prove Petitioner's innocence and dispute the validity of complainants allegations, showing prior recanting. (*Id.* at 11) Petitioner attached the affidavits of Gary Secore and Johnny VanCamp, stating that they "knew for a fact" that both victims and their mother lied concerning the allegations against Petitioner, and that they were

present when one of the victims attempted to tell Petitioner's counsel that she wished to recant. (Doc. No. 62, Ex. 8)

Petitioner alleged in his petition for review to the Arizona Supreme Court, (Doc. No. 62, Ex. 7), that counsel did not present any arguments, in the settlement conference, to show why and how the State had such a weak case against Petitioner. (*Id.* at 5) Petitioner asserted that the case was and is based on allegations of a witness who had recanted numerous times prior to acceptance of the plea. (*Id.*) Petitioner further asserted that when the settlement conference judge stated that, in recantation cases, "when they change their story, the original story is the true one," [counsel] should have pointed out that many of the recantation cases are in fact true in the recantation. (*Id.*)

This Court finds that Petitioner's first claim, construed liberally, was exhausted in the state courts. Accordingly, the Magistrate Judge will address the merits of this claim.

> **2.**   **Petitioner's plea was involuntary on the grounds that his attorney improperly threatened, coerced, and intimidated him into accepting the plea.**

In Ground Two of the Petition, Petitioner asserted that he "contin[u]ously insisted on going to trial throughout each and every proceeding he attended. Even though the plea was for a period of time between 13-27 years, the Petitioner insisted on going to trial and proving his innocence, taking a huge risk, and whatever the outcome would have been he would have lived with. However, by his counsel's advice, coercive and threatening behavior, and intimidation, defendant accepted the plea..." (Petition, p. 6.)

Petitioner explained, in his motion for evidentiary hearing, that his pleas were the involuntary product of coercion by counsel, and that he would not have accepted the pleas were it not for counsel's "strong-arm and overwhelming tactics." Petitioner alleges that, in light of his unique emotional fragility and related psychological issues,

counsel's combatively forceful approach - fist-slamming, yelling, and belittling - were so overwhelming as to deprive him of the opportunity to knowingly and intelligently evaluate the proferred plea.

Respondents acknowledge that this claim was exhausted, but assert that the trial court's finding of failure to present a colorable claim was not an unreasonable application of *Strickland*. The Magistrate Judge will address the merits of this claim.

> **3.** **Petitioner's Sixth Amendment right to counsel was violated during the sentencing phase of trail by counsel's failure to present any mitigating evidence and by affirmatively undermining Petitioner's efforts to secure a lesser sentence.**

Petitioner alleges in his motion for evidentiary hearing that counsel knew that his client was facing a wide sentencing range, 13-27 years, nonetheless, when asked by the court whether he had prepared any case in mitigation for his client, responded that he had not. Furthermore, counsel attempted to explain his lack of mitigation by telling the sentencing judge that his efforts were "unproductive."

This claim, however, apart from not having been raised in the State courts, was not raised in Petitioner's federal habeas petition. Petitioner's arguments raised in his Petition, that counsel was ineffective at his sentencing hearing, were specifically intended to address only counsel's refusal to assist him with his motion to withdraw, which occurred, as Petitioner acknowledges, "prior to sentencing." (Petition, p.5B.) Respondents have had no opportunity to address this claim.

Accordingly, the Court will not address Petitioner's claim raised for the first time in his motion for evidentiary hearing, that his trial counsel was ineffective at his sentencing hearing because this claim was not raised by Petitioner.

> **5.** **Trial counsel's refusal to assist Petitioner in preparing for or participating in the withdrawal of plea hearing constitutes a violation of the Sixth Amendment.**

Petitioner asserts that trial counsel's refusal to assist Petitioner in preparing for or participating in the withdrawal of plea hearing constitutes a violation of the Sixth Amendment. Petitioner further asserts that Petitioner affirmatively hindered Petitioner's efforts to explain his desire to withdraw his plea.

Petitioner argued in his petition for review to the court of appeals that "Defendant was heard on a motion to withdraw. Mr. Kennedy refused to argue on behalf of Defendant, hence the motion was denied by Judge Reinstein." (Doc. No. 62, Ex. 6, p. 4.) Petitioner also asserted that at his sentencing hearing, "Defendant again tried to withdraw from his plea, was again not represented by Mr. Kennedy, and was again denied." (*Id.*, p. 5.) Petitioner argued to the court of appeals, however, that, pursuant to Arizona law, both the trial judge and change of plea judge abused their discretion in not allowing Defendant to withdraw from his plea. Petitioner argued that he should be able to withdraw from his plea agreement and face the original indictment. (*Id.*, p. 13-14.)

Respondents point out that the claim, as raised by Petitioner to the court of appeals, was raised as a state law claim. (Doc. No. 57, p. 30.) The claim petitioner raises now in this habeas, that counsel's failure to assist him in his motion to withdraw constitutes a Sixth Amendment violation, was not raised in the State courts.

Petitioner's right to direct review having been completed, he would have to present this claim in an additional petition for post-conviction relief in order to exhaust the claim. Under Arizona law, a defendant convicted pursuant to a plea agreement must file a notice of post-conviction relief within ninety days of the entry of judgment and sentence or within thirty days after the issuance of the final order or mandate by the appellate court in the petitioner's first petition for post-conviction rlief proceeding. 32.4(a), Ariz.R.Crim.P. Petitioner has already completed his first Rule 32 proceeding. If Petitioner were to fairly present this issue in another petition for post-conviction relief, such presentation would be untimely. Moreover, this claim does not qualify for

any of the timeliness exceptions.  Rules 32.1 and 32.4(a), Ariz.R.Crim.P.  Such a new petition, therefore, would be subject to summary dismissal.  *State v. Rosario*, 195 Ariz. 264, 266 (App.1999); *State v. Jones*, 182 Ariz. 432 (App.1995); *Moreno v. Gonzales*, 192 Ariz. 131, 135 (1998) (timeliness is a separate inquiry from preclusion). Moreover, Petitioner would be precluded from raising this claim in another petition for post-conviction relief. Rule 32.2(a), Ariz.R.Crim.P.  This claim, therefore, is procedurally defaulted.  *Park v. California*, 202 F.3d 1146, 1150-51 (9th Cir.2000) (federal habeas review is precluded where prisoner has not raised his claim in the state courts and the time for doing so has expired).

Accordingly, federal habeas review of Petitioner's fifth claim is barred absent a showing of "cause and prejudice" or a "fundamental miscarriage of justice."  *Dretke v. Haley*, 541 U.S. 386, 393-94 (2004); *Carrier*, 477 U.S. at 488.  The Magistrate Judge finds that no showing of cause and prejudice or a fundamental miscarriage of justice has been made.

F.     Grounds One and Two (Ineffective Assistance of Counsel): Merits

"The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill v. Lockhart*, 474 U.S. 52, 56 (1985).  When, as here, a defendant alleges ineffective assistance of counsel during a plea process, the two-part test in *Strickland v. Washington*, 466 U.S. 668 (1984) applies. *Wright v. Van Patten*, 552 U.S. 120, 128 (2008); *Hill*, 474 U.S. at 57-58.  The *Strickland* test requires Petitioner establish deficient performance by counsel and prejudice resulting from that performance to obtain relief. *See Luna v. Cambra*, 306 F.3d 954, 961 (9th Cir. 2002), *amended,* 311 F.3d 928.

First, a petitioner must show that counsel's representation fell below an objective standard of reasonableness. *Hill,* 474 U.S. at 56, 58.  In other words, "the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence

demanded of attorneys in criminal cases.'" *Id.* (citation omitted). Deficient performance requires that counsel's errors "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 694. The Petitioner must overcome the strong presumption that counsel's conduct was within the range of reasonable professional assistance required of attorneys in that circumstance. *See Strickland*, 466 U.S. at 687 (1984); *Allen v. Woodford*, 395 F.3d 979, 1005 (9th Cir. 2004).

Second, in the context of guilty pleas, the prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill*, 474 U.S. at 59. In the context of a guilty plea, a defendant may satisfy the prejudice prong by showing that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Hill*, 474 U.S. at 52, 58 (1985).

Whether a petitioner can prevail on a claim of ineffective assistance of counsel for failure to investigate a potential defense depends in large part on whether the potential defense "likely would have succeeded at trail." *Hill*, 474 U.S. at 59; *see also Lambert v. Blodgett*, 393 F.3d 943, 982 (9th Cir. 2004) ("Where the alleged error is counsel's failure to investigate a potential defense, the salient inquiry is whether discovery of the evidence would have led counsel to change his recommendation as to the plea. In turn, the result of this inquiry may depend on whether the defense would have likely succeeded at trial.")(internal quotation marks, brackets and citation omitted).

The Court need not address both components of the test if petitioner makes an insufficient showing on one. *Strickland*, 466 U.S. at 694. The petitioner bears the burden of proving his case, and must convince the district court "by a preponderance of evidence" of the facts underlying the alleged constitutional error. *See Lambert*, 393 F.3d ; *McKenzie v. McCormick*, 27 F.3d 1415, 1418-19 (9th Cir. 1994)(quoting *Johnson*

*v. Zerbst*, 304 U.S. 458, 469 (1938); *Bellew v. Gunn*, 532 F.2d 1288, 1290 (9th Cir. 1976)).

## 1. Relevant Facts

### a. Indictment

Petitioner was arrested on September 15, 1998, and indicted on 13 sexual conduct counts for crimes committed against Petitioner's minor daughters. The indictment charged nine counts involving his step-daughter, Bobbie Jo, less than fifteen years of age: five counts of sexual conduct with a minor, (class 2 felonies and dangerous crimes against children), two counts of molestation of a child, (class 2 felonies and dangerous crimes against children); and two counts of sexual abuse (class 2 felonies and dangerous crimes against children). The indictment charged four counts involving his step-daughter Durina Farrall, over the age of fifteen: two counts of sexual conduct with a minor, (class 2 felonies); one count of sexual abuse (a class 5 felony); and one count of furnishing obscene or harmful items to minors (a class 4 felony). (Ex. 57.)

### b. Interviews

#### i. <u>Durina</u>

The police report stated that Durina told Phoenix Police Detective Laird that Petitioner had, the day of his arrest, demonstrated sex acts with her, and, while clothed, rubbed her vagina, and attempted to pull her pant leg aside to place his hand in direct contact with her vagina. (Ex. 50, p. 3.) Durina said Petitioner had made reference to the fact he had been doing these kind of things, and having sex with Durina's sister Bobbie Jo for a long time, and suggested that the three of them should have sex at the same time. (Ex. 50, p. 3.) Durina explained that when Petitioner was demonstrating sex acts with her it was in order to show her what he had actually been doing with Bobbie Jo. (Ex. 50, p.7.) Durina said that, due to everything the Petitioner said, there was no doubt in her mind that he had been having sex with Bobbie Jo for quite some

time.  (Ex. 50, p. 8.)  Durina also related that Petitioner confirmed to her that when she was 11, and living in Orlando, Florida, with Petitioner, what she thought might have been a dream, where she felt like she woke up and felt Petitioner touching her vagina, had actually occurred.

Durina told Detective Laird that she first became uncomfortable around Petitioner a week before the Fourth of July holiday, when he commented to her that he was having sexual dreams about her, and that he was paying attention to her when she was wearing her bathing suit.  (Ex. 50, p. 5.)  Durina also related an incident in which Petitioner showed her and her sister an x-rated movie, and that while the movie was being shown Petitioner was watching it with the girls.  (Ex. 50, p. 5-6.)

At the evidentiary hearing, Durina reviewed the police report (Ex. 50, p. 3), and confirmed that the acts described in the report were the acts that had occurred the morning of the day Petitioner was arrested.  (Tr. 9/23/09, p.66.)  Durina testified that she had observed during the acts that Petitioner was not physically erect.  (Tr. 9/23/09, p. 67.)  Durina testified that Petitioner had shown her a pornographic movie but had signed a declaration that she thought that the movie was for an educational purpose regarding the importance of using condoms, and that she believed her father left the room while the movie was playing.  (Tr. 9/23/09, p.69-70.)

Durina testified that she was not at the evidentiary hearing to protect Petitioner, but felt that there were a lot of things that were said and had happened that needed to be clarified, and that this was her chance.  (Tr. 9/23/09, p.73.)  Durina testified that, although she is known for her honesty, she doesn't remember the things that are stated in the police report happening to her.  (Tr. 9/23/09, p. 77.)  She believes that if it had happened she would remember, but doesn't recall the statements she gave in the report about how Petitioner touched her.  (Tr. 9/23/09, p.77.)  Durina testified that although the police report stated that Durina informed the police that Petitioner was watching the pornographic video with the girls, and that Durina told the police that Petitioner told her

about sexual contact he had with Bobbie Jo, she did not remember that, but agreed that her memory would have been better back when she gave the statement. (Tr. 9/23/09, p.82.) Durina stated that she felt if these things happened, she didn't think it would be something she would forget. (Tr. 9/23/09, p.82.)

When asked about her declaration that she believed that what Petitioner did was not right but she thought he had gotten too long of a sentence for that, Durina explained that she felt that she didn't believe that Petitioner sexually hurt her, that there were a lot of men in the system that are really abusing children, and that he shouldn't be there. (Tr. 9/23/09, p.84.) When asked if it was possible that the reason she didn't remember the things that were said in the report is because she just didn't say the things that were in the report, Durina replied "I mean I feel I said it. But I don't remember it happening at all." Auzerae Patty[2] testified at the evidentiary hearing that Durina called her, while the case was ongoing, and confided in her that Petitioner never touched her, that it was a man in her mother's complex instead. (Tr. 9/23/09, p. 96.) Auzerae testified that she told her mother, and Joe Palmisano, Petitioner's attorney at the time, about the conversation. (Tr. 9/23/09, p. 99.) Auzerae was told by Mr. Palmisano that Auzerae, and Gary Secore Jr., who had listened in on the call, needed to prepare an affidavit. (Tr. 9/23/09, p. 100.) Auzerae said that she did not prepare an affidavit, because, after Paula Patty, Auzerae's mother was arrested, Mr. Palmisano withdrew from Petitioner's case to represent Paula. (Tr. 9/23/09, p. 101.)

ii.    <u>Bobbie Jo</u>

Bobbie Jo related to Detective Laird that Petitioner had been molesting her for a number of years, with the most recent incident occurring in July, 1998. (Ex. 50, p. 3.) Bobbie Jo did not testify at the evidentiary hearing.

---

[2]    Auzerae Patty is the daughter of Paula Patty, Petitioner's girlfriend at the time of his arrest.

### iii.    Petitioner

After Petitioner's arrest, he was interviewed by Detective Laird. (Ex. 50, p. 14-16.) Portions of Detective Laird's summarization of the interview are as follows: Petitioner denied the allegations, but "went into great detail" during the interview about how it is possible that things that he does could be misinterpreted, and that he was just trying to do what he thought was best for his girls to prepare them for life. (Ex. 50, p. 14.) Petitioner demonstrated to Detective Laird the different sex acts that he had shown Durina that day. (Ex. 50, p. 15.) Petitioner continued to deny that he would do anything to harm any of his girls, and that if any of them thought that his actions were wrong, they were misinterpreting what he was meaning. (Ex. 50, p. 15.) Petitioner also said during a portion of the interview that if he had done anything wrong or accidentally touched Durina in an improper manner he wished to apologize to her in order to make it better. (Ex. 50, p. 15.) Petitioner denied any sexual contact with Bobbie Jo. (Ex. 50, p. 15.)

### c.    *Confrontation call*

A confrontation call was conducted, wherein Petitioner denied Bobbie Jo's accusations, and initially denied that he had done anything wrong to Durina; later stating that he did not do the things to her to scare her, and was just trying to make Durina understand things that were going on. (Ex. 50, p. 4.) Durina asked Petitioner if he would promise to never touch "her coochie" again, and Petitioner said, "Okay, I won't do that anymore." (Ex. 50, p. 4.)

At the evidentiary hearing, Durina recalled a confrontation call with Petitioner where she asked him, "Will you promise me that you won't rub on me no more?" (Tr. 9/23/09, p.78.) Durina did not remember Petitioner stating "Yeah, I'm past that." (Tr. 9/23/09, p.79.) Durina understood that the acts for which he apologized during the call were the acts that occurred that morning with Durina in the bedroom. (Tr. 9/23/09, p. 68.) Durina explained that the detective was writing things down and holding them up

for her to say because she needed to be specific. (Tr. 9/23/09, p.78.) Durina did not remember saying to him, "Dad, promise me one thing. Promise me you won't touch my coochie again." (Tr. 9/23/09, p.79.) Durina thought that it would not refresh her recollection to play the tape, because she just didn't remember any of those things happening that day. (Tr. 9/23/09, p.79.) Durina clarified that, even though she testified that the detective was giving her papers with things to say on the phone call, she was not saying that those things had not happened. (Tr. 9/23/09, p. 80.)

### d. *Letters from Petitioner*

Petitioner wrote letters to his daughter Christina, from jail, requesting that she assist him in getting the charges dropped. (Ex. 79.) In relevant part, Petitioner explained:

> Its not for anyone to do the judging except God if someone does something to me or you or anyone we're to forgive them and ask God to forgive them and when they die God judges them....
>
> . . .
>
> Durina says I rubbed her crotch and just for one charge of her saying that is 13 to 23 years in prison. I was looking at a list of prison sentences and for me giving the video to watch can get me up to 5 years in prison. Please talk to them about just saying all of this never happened and let God be the judge of me.

(*Id.* at Batch number 000092.) Petitioner also informed his daughter:

> I just need to be given this last chance. I have a different inner being and Satan no longer has a power over me….. This is so serious.
>
> . . .
>
> I'm a good dad. I've just made some mistakes in my life. We all do but the Lord has taken all of the wrong away from me and he has given me a new and better life now.
>
> . . .

(*Id.* at Batch number 000095-96.)

### d. *Counsel's Investigation and Trial Preparation*

Before the plea was entered, Petitioner's counsel, Mark Kennedy, conducted a thorough investigation into Petitioner's case. Kennedy was appointed on March 29,

- 24 -

1999, and was the fifth attorney appointed to represent Petitioner. (Tr. 9/22/2009, p.83, 175, Ex. 51 p. 2.) He attempted to ensure that the file materials he received were complete by asking for a whole new set. (Tr. 9/22/2009, p.93, Ex. 61.) He obtained and reviewed over 295 pages of disclosure materials from the prosecutor's office, and summarized his review in a database summary of each individual page of disclosure.[3] (Tr. 9/22/2009, pp.85-85; Evidentiary Hearing, Ex. 60.)

Counsel requested records from the Custodian of Records at Maricopa Medical Center for every document in their files concerning the two victims as well as Petitioner. (Tr. 9/22/2009, p.115-16; Ex. 70-72.) Kennedy explained that CPS records regarding prior sexual abuse of Bobbie Jo by her paternal grandfather were not in his database, that although he had subpoenaed the records he had no way of knowing if he had gotten everything and he had no reason to know that he had not gotten all of the CPS records since no one had told him of the abuse. (Tr. 9/22/2009, p.238-39.) The Attorney General's office objected to his request for documents requested from DES, but counsel obtained a court order for their production. (Tr. 9/22/2009, p.123-24; Exs. 71, 74; Ex. 51, p. 9.) Counsel also requested the records of Bobbie Jo from the Gila Valley Clinic in Safford, Arizona. (Tr. 9/22/2009, p.117; Ex. 72.)

Despite the scheduling of a settlement conference, counsel proceeded to prepare for trial; submitting two requests for an investigator's assistance to interview more witnesses and for assistance at trial. (Tr. 9/22/2009, p.130-32, 134; Ex. 69, 73.) Counsel testified that he believed that the second request, submitted on August 20, 1999, was later withdrawn or otherwise not acted upon. (Tr. 9/22/2009, p.135; Ex. 73.)

---

[3]     Bates stamped pages 1 - 295 of Exhibit 50 are the disclosed documents that correspond to the database prepared by Petitioner's counsel, and found at Exhibit 60. Although the database ends at note card 295, the documents in Exhibit 50 continue to Bates number 316. (Tr. 9/22/2009, pp. 91-92)

*e.      Possible recantation*

Petitioner's counsel was aware of the possibility that one or maybe both of the victims might recant.   First, the month after Petitioner was arrested, the victims approached the prosecutor, and, through their mother, informed her that they wanted to drop the charges.  (Ex. 50, p. 76.)  The victims mother and the two victims were driven to the county attorney's office by Paula Patty, the Petitioner's current girlfriend, and approached the prosecutor in her office to attempt to drop the charges.  (Tr. 9/23/2009, p. 15-17; Ex. 50, p. 76.)  The victims' mother explained to the detective that the girls were again "still getting a lot of pressure from Paula" and "several different people" to drop the charges against the Petitioner.  (Tr. 9/23/2009, p. 16-17; Ex. 50, p.76.)  Although the victims and their mother did not proceed to the main police station as requested for interviews, when Detective Laird followed up by conducting interviews of both victims, Durina related that she did not want to drop charges against Petitioner because what he had done to her was wrong, and he needed to be punished for it, but that Paula had been making phone calls to their house and had come over and explained that if Durina only pressed charges on furnishing of alcohol and pornography, he would only get 8 years instead of 25 years for each crime.  (Tr. 9/23/2009, Ex. 50, p. 77.)  The detective also reported that Durina explained that Paula had told Durina that she had been to visit Petitioner and he looked bad, and that all of this made Durina sad.  (Tr. 9/23/2009, Ex. 50, p. 77.)  Durina agreed that Paula would give her a ride to the county attorney's office and drop the charges.  Durina explained that she did this in order for Paula to leave them alone.  (Tr. 9/23/2009, Ex. 50, p. 77.)  Victim Bobbie Jo reported to Detective Laird a similar story, that Paula had been pressuring Bobbie Jo to drop the charges, telling Bobbie Jo that if she didn't drop the charges, Petitioner would spend the rest of his life in prison and probably get killed while there.  (Tr. 9/23/2009, Ex. 50, p. 77.) Defense counsel had reviewed and summarized these reports regarding the victims' attempts to "drop the charges" due to pressure exerted by Paula Patty, and Durina's

subsequent affirmation that she did not want to drop the charges. (Ex. 60, entries 75-82.)

At the evidentiary hearing, Durina Farrall testified on behalf of Petitioner that when she went to see the prosecutor with Paula Patty, that when she got there, she "just kinda froze up" and there's been a lot of things that she felt she didn't say because she was really scared of going to jail. (Tr. 9/23/09, p. 48-50.) Durina explained that, although she said she wanted to clarify what was going on, in reference to the day Paula Patty drove her to the police station, she never wanted to say Petitioner did not do any of these things ever. (Tr. 9/23/09, p.83.)

In a second incident, Durina approached Petitioner's counsel in court. John Van Camp, a family acquaintance, testified that he took Durina to the hearing. (Tr. 9/22/09, p. 37.) Durina had approached Van Camp and Gary Secore, another friend and "said that she wanted to set the record straight, to get him out of jail, because he'd been in long enough." (Tr. 9/22/09, p. 38.) Out of an abundance of caution, believing that speaking to Durina would be inappropriate, Kennedy did not speak to Durina when she approached him in court at a hearing held on the very first day he was appointed to Petitioner's case. (Tr. 9/22/2009, p.126-27; Ex. 51, pp.1-2.) Counsel testified that he was "not prepared to do anything but be cautious, and research the issue, because [he] didn't want to be in violation of [Arizona victim's rights statute], or ... be held in contempt." (Tr. 9/22/2009, p.181.) After being told at the evidentiary hearing that the statute prohibits only the initiation of contact of a victim by defense counsel, counsel stated that he had to "make a decision on the fly" and "in this particular case [he] chose caution." (Tr. 9/22/2009, p.181-82.) Van Camp testified that Durina was threatened by a man he believed to be a prosecutor, that if Durina changed her story, he would have her brought up on charges. (Tr. 9/22/2009, p. 42-44.) Van Camp testified that Durina never admitted to him that she lied. (Tr. 9/22/2009, p. 54.)

After counsel was approached by Durina, he did not follow up by having his investigators speak to the victims, or by formally requesting interviews with them, because he believed, from his experience, that the chances of obtaining an interview with the victims "were zero." (Tr. 9/22/2009, p.182-84, 232.) Counsel requested that the County Attorney's office arrange for interviews of various witnesses, although he never interviewed Sheila Farrall, the victims' mother, or the victims' brother, Frank West. (Tr. 9/22/2009, p.109, 187, Ex. 51, p. 45.)

The victims, however, were interviewed for purposes of the pre-sentence report, and provided the following information, indicating that neither victim had a desire to recant:

> Bobbie Jo West did not wish to discuss the offense with this officer but issued a statement through her grandmother, Karen Frapp. She never wants to see the defendant again as his behavior has devastated her. However, she has to learn to live with what happened as there is no way the defendant's behavior can be reversed. She does not believe she is God and cannot judge what should happen to another person's life. She is angry and hurt by the defendant's behavior. She is not requesting restitution.

> Durina Farrell (sic) is doing fine at this time, as long as the offense is not mentioned. The defendant's behavior and the abuse bother her a great deal when she is confronted regarding the abuse. Durina reiterated that the defendant actually touched her vagina and advised he had been participating in this type of behavior since she was eleven. She reaffirmed that the defendant also touched Bobbie Jo in a sexual manner many times. Shortly after the abuse, Durina was caught shoplifting and was placed in a diversion program which included counseling. She sees Heidi Miller once a week relative to the shoplifting and the sexual abuse. She has no desire to have any contact with the defendant and does not want to judge him. She had no comment as to an appropriate sentence and is not requesting restitution.

Statement of Interested Parties:

> Karen Frapp the grandmother of both victims, advised that Bobbie Jo went "daffy" and is hard to control. She has been doing much better until she heard the defendant may withdraw from his plea. Durina appears to have recovered better and is looking to join the Air Force. The defendant is sending her letters to give to the victims. She does not believe he should have any contact with the victims and hopes the Court will order

- 28 -

him to stop the attempted contact. She had no further comment as to sentencing.

(Supplemental Answer to Petition for Writ of Habeas Corpus, Doc. 57, Ex. CC, pp. 1-2)

Durina testified at the evidentiary hearing that she wanted to talk to Petitioner's counsel at the courthouse about the events that took place on the day he was arrested, the same day the charges indicated he simulated sex acts. (Tr. 55-58.) Durina testified, however, that she did not remember exactly what she wanted to tell him. (Tr. 9/23/09, p.58.) Durina remembered telling her mom what happened, and that was the day she went to the police. (Tr. 9/23/09, p. 60) Durina also told Bobbie Jo, and though she knew it "was a big deal" she thought Bobbie Jo and her mother made it a "really big deal." (Tr. 9/23/09, p. 61.)

Durina testified that, in her experience, it had happened a lot that Bobbie Jo had told her something of a sexual nature about someone, including an allegation that Bobbie Jo had slept with Durina's boyfriend, then "weeks or months later she then said it never happened." (Tr. 9/23/09, p.63-64.) Durina agreed that when she went to talk to Petitioner's counsel, she would have told him what she told the court during the evidentiary hearing. (Tr. 9/23/09, p. 72.)

Frank West, the victim's brother, testified that Durina's story had "always more or less been the same" and agreed that, as far as he knew, Durina had not lied about the allegations. (Tr. 9/22/09, p. 31.)

The prosecutor testified at the evidentiary hearing that, in her experience as a sex crimes prosecutor for over 20 years, she had dealt with victims who recanted many times, and that there are numerous reasons: pressure from the family, financial pressures, love for the offender, minimizing the behavior in hopes of getting "things back to normal," and guilt when the offender is removed from the home or the family disintegrates. (Tr. 9/23/2009, p. 14.)

The prosecutor affirmed that in her experience she had prosecuted cases successfully many times where victims had recanted at one point, and had also successfully prosecuted cases where a victim had fabricated sexual abuse in the past. (Tr. 9/23/2009, p. 17.)  The prosecutor denied ever threatening a victim that if they changed their story they would be "locked up or incarcerated," nor that any of her staff or detectives or officers she had worked with had, to her knowledge, similarly threatened a victim.  (Tr. 9/23/2009, p. 17.)

### f.   Credibility of Witnesses

Counsel was aware that one of the victims, Bobbie Jo had alleged prior molestations by Rachel Morgan in 1992, Brian Green in 1993, and by a person known as "Uncle Stanley" in 1988, and requested copies of the corresponding police reports. (Tr. 9/22/2009, p.111-12, 148; Ex. 60, entries 60-63, 72-74; Ex. 51, p. 45; Ex. 60, . 60-63, 72-74, 173-174, 176-177.)  Counsel was also aware that Bobbie Jo had made previous allegations against Petitioner when she was nine years old, recanted them, and later explained that the reason she recanted her reports is because she thought it was the only way she could come home again. (Tr. 9/22/2009, p. 147-148; Ex. 50, p. 203-204.) Bobbie Jo's brother, Frank West, testified that when he was two or three, he remembered Bobbie Jo admitting she had lied when his mom had a gun to Petitioner's head and was about to shoot Petitioner. (Tr. 9/22/09, p. 15-16; Ex. 50 at 245.)  Frank testified that the day Petitioner was arrested, his mother instructed him to lie to the police and tell them that what Bobbie Jo was saying was true. (Tr. 9/22/09, p. 18-19.) Although Frank had told Detective Laird in his interview with him that he wanted to protect Petitioner, he did not tell him that his mother instructed him to lie. (Tr. 9/22/09, p. 28.)  Frank testified that his mother admitted to him, after Petitioner's sentencing, that she told Bobbie Jo and Durina to lie.  (Tr. 9/22/09, p. 25, 27.)

Counsel was unaware at the time he advised Petitioner to accept the plea that CPS records disclosed that victim Bobbie Jo had been molested by her paternal

grandfather and that Sheila Farrall viewed Bobbie Jo as a liar with a remarkable history of detailed lies, including lies to the police. (Tr. 9/22/2009, p.191-92.) Counsel received records from the Gila Valley Clinic of an examination of Bobbie Jo in response to a report of possible sexual molestation by her step-dad "Rick" and DES's subsequent referral to Orlando, Florida authorities urging them to prosecute. (Tr. 9/22/2009, p.118; Ex. 60, p. 208, 213.) Auzerae Patty, Paula Patty's daughter, testified that Bobbie Jo had told her, prior to the events of the present case, that the Florida incident had never happened; that Petitioner had never touched her. (Tr. 9/23/09, p. 93.) Auzerae didn't tell anyone but her own mother about this conversation with Bobbie Jo. (Tr. 9/23/09, p. 98.)

>    *g.*      *Counsel's communications with Petitioner and advice*

Kennedy met with Petitioner, who denied the allegations and wanted to submit to a polygraph examination and to present the presumably favorable results to the prosecutor. (Tr. 9/22/2009, p.84.) Petitioner requested and was approved for funds to provide a polygraph test to Petitioner who insisted on his innocence. (Tr. 9/22/2009, p.100, Ex. 65.) Counsel recollected that polygraph examiner, Jim Hanwratty, performed the polygraph examination of Petitioner, but he did not present the results of the examination to either the prosecutor or the Court because there was nothing positive to report. (Tr. 9/22/2009, p.104-05.) The polygraph examiner signed a declaration saying that counsel had never had him do a polygraph examination. (Tr. 9/22/2009, p.177) Petitioner confirmed, however, that he had in fact received a polygraph. (Tr. 9/23/2009, p. 176.) Additionally, prison visitation logs reflect a visit by the polygraph examiner, in direct conflict with the declaration signed by Hanwratty. (Doc. No. 94, p.2.)

Kennedy provided Petitioner with grand jury transcripts, and sent Petitioner a copy of the disclosed material that he received, and urged Petitioner to stop writing letters and to assume that his telephone calls and visits were being monitored. (Tr.

9/22/2009, p.96-98, Exs. 62-63.) Petitioner testified that he did not receive the grand jury transcripts. (9/23/09, p.165.) Counsel supplemented the disclosure to Petitioner after he obtained further documents during the course of his interview of Phoenix Police Department Detective Laird. (Tr. 9/22/2009, p.99, Ex.64.) On July 1, 1999, counsel sent Petitioner a letter confirming Petitioner's refusal to let him review the plea agreements with Petitioner. (Tr. 9/22/2009, p.107-08, Ex. 68.) Thereafter, probably at the request of counsel, a settlement conference was scheduled to allow counsel to review the terms of the plea agreements with Petitioner. (Tr. 9/22/2009, p.128-29.) Counsel believed that Petitioner needed to be fully and fairly advised of the plea, and that he needed to listen to a neutral third party because he was not being rational in his belief that the victims would either not appear, or appear and recant. (Tr. 9/22/2009, p.129-30.)

Trial counsel testified that the evidence against Petitioner consisted of the interviews of the child victims, the transcript of the confrontation call, an extensive interview of Petitioner by the Phoenix Police Department detective and Sheila Farrall's interjections in that interview, and two separate letters Petitioner mailed from the jail. (Tr. 9/22/2009, p.138-140.) Specifically, counsel described the confrontation call as "pretty damaging," noting that he thought Petitioner made statements about these events being in the past, and admitted to simulating sex acts with Durina and supplying pornographic material to the victims. (Tr. 9/22/2009, p.140) Counsel had explained to Petitioner's habeas attorney that Petitioner was "in the soup"as a result of making some admissions, and that he would be convicted of the additional charges because of that. (Tr. 9/22/2009, p.203) Counsel recognized that the settlement conference judge had explained to Petitioner that, as to the charges of furnishing obscene materials and simulated sex acts, to which Petitioner had admitted in the confrontation call, that alone "warranted him being in prison a very long time." (Tr. 9/22/2009, p.206) Counsel testified that he believed it was "theoretically possible" that if Petitioner had no sexual

motif as to the charges involving simulated sex acts and providing obscene materials that he could not be convicted under the relevant statutes. (Tr. 9/22/2009, p.219-20)

The prosecutor testified that the Petitioner made statements that minimized his behavior and couched it in terms of the victims misunderstanding things, which is typical behavior for sex offenders. (Tr. 9/23/2009, p. 10.) The prosecutor also noted that he admitted doing some inappropriate demonstrations which coincided with the description provided by the victims, and that Petitioner's admission of showing the victims a pornographic video was typical grooming behavior for offenders. (Tr. 9/23/2009, p. 10.) The prosecutor believed that, in her experience as a sex crimes prosecutor for over 20 years, that the statement would have been admissible, and that a jury would believe that anybody who is truly innocent of these types of charges would flat-out deny them and be upset, and that if juror's heard the admission of part of the acts or apologizing they would tend to believe the entirety of the victims statements. (Tr. 9/23/2009, p. 12.)

Counsel testified that when he was advising Petitioner, he took into his calculation the previous allegations of molestation of Bobbie Jo by Petitioner and others, as well as her attempt to recant this previous allegation against Petitioner and the opinion of a psychologist that the original allegation was reasonable, consistent and accurate, and that Bobbie Jo was recanting in order to return home. (Tr. 9/22/2009, p.147-49.) Petitioner also considered the evidence disclosed by CPS. (Tr. 9/22/2009, p.152; Ex. 50, p. 148-295.) Counsel acknowledged that, although he obtained a court order for the production of further CPS and DES documents on August 23, 1999, he advised Petitioner to plead guilty on August 26, 1999. (Tr. 9/22/2009, p. 194.) Counsel acknowledged that, prior to advising Petitioner to plead guilty, he had not received the full police report regarding the allegation by Bobbie Jo against Rachel Morgan that concluded that the story was concocted. (Tr. 9/22/2009, p.198-99; Ex. 50, p. 62-63; Ex. 51, p. 68-72.) Counsel testified that had he had them, he would have taken them into

his calculation, bud didn't think they would have been definitive. (Tr. 9/22/2009, p.236-37.) Counsel also acknowledged he had not, at the time he advised Petitioner to plead, obtained police reports related to Bobbie Jo's accusations that the apartment manager in the building she lived in molested her, one day before she accused Petitioner of molesting her. (Tr. 9/22/2009, p. 201; Ex. 50, p. 311-12.) Counsel acknowledged that he had gotten the plea deadline extended once, but that it would be "a very dangerous business" to keep getting that extended until he felt like he had exhausted every avenue of investigation in the case. (Tr. 9/22/2009, p.233)

Petitioner testified telephonically at the evidentiary hearing. (9/23/09, p. 140.) Petitioner recalled meeting with counsel twice before the change of plea hearing, once very briefly, and a second time Petitioner presented the prosecutor's plea offer. (9/23/09, p.142.) Petitioner looked at the plea and noticed "right off the bat" that the range was 13-27 years. (Tr. 9/23/09, p.142.) Petitioner told him he needed to take a look at it, and then showed Petitioner a video of Bobbie Jo's interview in 1993 after the Florida allegations. (Tr. 9/23/09, p. 143.) Petitioner told counsel that it was "a bunch of crap" and Bobbie Jo was lying. (Tr. 9/23/09, p.144.) Counsel grabbed up his stuff, angrily, and threw it all in his briefcase and left. (9/23/09, p.144.) Although these were the only two visits Petitioner remembers, he did remember conversing with counsel or his secretary over the phone. (Tr. 9/23/09, p.145.)

At the settlement conference, Petitioner testified that, during a break from discussions with the settlement judge, he spoke with Petitioner and Petitioner told counsel he was not going to take the pleas, that he hadn't done anything to Bobbie Jo. (9/23/09, p. 151.) Counsel told Petitioner to talk with his dad who advised him that "the State had a lot against him, and that he would probably go to prison for the rest of his life." (Tr. 9/23/09, p. 151.) Petitioner told counsel he was "absolutely not" going to sign the plea agreements, but that he was "teary-eyed" and "kinda feeling pressured." Counsel then grabbed the papers, stepped away from the desk, and then "all of a sudden

he swung around and the papers breezed in [Petitioner's] face, and he slammed it on the table and he got in [Petitioner's] face, maybe three, four inches away from [Petitioner's face and said 'Sign the damn thing.'" (Tr. 9/23/09, p. 151-52.) Petitioner signed the agreement. (Tr. 9/23/09, p. 152.) Petitioner stated that when he got back to jail, and realized what happened, he called counsel telling him he wanted to withdraw from the plea and told counsel that he had "done me wrong" by helping him switch the plea bargain. (Tr. 9/23/09, p. 154.) Petitioner stated that he felt like he "didn't know what was going on" when he signed the plea. (Tr. 9/23/09, p. 156.) Petitioner explained that he didn't even understand the hearing, and all he knew was that the judge bombarded him with a whole bunch of stuff. (Tr. 9/23/09, p. 158.) Petitioner stated that he knew the names of the charges against him, but didn't understand them. (Tr. 9/23/09, p. 158.) When confronted with his letter that he wrote to his daughter Christina, discussing his charges and the sentence he faced, he explained that he understood the possible sentence he faced because he showed his booking sheet to his cellmate, who then gave him that information. (Tr. 9/23/09, p. 161.)

Counsel denied that, in talking to Petitioner, he ever slammed his fist on the table or yelled at him, although he admits being "very direct with him." (Tr. 9/22/09, p. 152-153.) Petitioner's father testified that he was present at the hearing, and, although he did not recall much of what happened, he testified that counsel shook his finger and a piece of paper at Petitioner, that he was trying to tell Petitioner to admit guilt, and that there was some verbal abuse directed towards counsel from Petitioner. (Tr. 9/23/09, pp. 126-129.)

Van Camp was not present at the time Petitioner signed the plea agreements, but that Petitioner called him shortly after, and told him he did not want to sign the plea agreements, that after he thought about it he said he'd rather have taken it to trial. (Tr. 9/22/09, p. 45-46.) Tom Ward, a friend of Petitioner's was present in the courtroom at Petitioner's plea hearing. (Tr. 9/22/09, p. 63-64.) Ward testified that at the end,

Petitioner was crying and "dysfunctional" and when they took a break Petitioner's counsel told Petitioner "there's no light at the end of the tunnel," that if he didn't plead guilty he would never have a life or a hope of getting out ever. (Tr. 9/22/09, p. 65.) Ward described Petitioner as having "tears in his eyes," not bawling, but "just shattered." (9/22/09, p. 66.) Ward described Petitioner's attorney as aggressive and "angry or in a hurry," telling Petitioner that "[i]f we go to trial it's there [sic] word against yours and there's two of them, and they've already said all this." (Tr. 9/22/09, p. 67.) Ward reflected that he didn't actually remember counsel saying that, but he was basically saying "This is your only hope." Tr. 9/22/09, p. 67.) Ward was totally floored and distraught over the whole thing - hearing what Petitioner was getting accused of and what the sentencing was- and Petitioner was "just losing" it, that it was "just totally outrageous." (9/22/09, p. 68.) Ward stated, however, that after counsel spoke with him, he advised Petitioner to "probably take the plea, because they said you'd never get out of prison ever, you'd be locked up the rest of your life." (9/22/09, p. 73.) Ward stated that he didn't remember if he was at Petitioner's sentencing hearing but thought that he was, but hadn't had any contact with Petitioner, not even letters or phone calls, since the change of plea hearing. (9/22/09, p. 69, 71.) Ward testified that, at the time, even believing Petitioner to be one hundred percent innocent, he would have taken the plea, based on looking at his whole life in prison, or getting out in 20 years, specifically, being told by counsel of the threat of life in prison, and that it was an open and shut case. (9/22/09, p. 76.)

As the judge had explained at the settlement conference, Petitioner was facing a possible prison sentence of over 200 years on the charged crimes; and, in the settlement conference judge's mind, a prison sentence would be warranted simply for the crimes to which Petitioner admitted, and only 13-27 years with the possibility of parole for the crimes charged in the plea agreement. (Ex. 54, Settlement Conference Transcript, 8/26/19, pp 2-3, 7.) The settlement conference judge further explained that,

based on his experience as a judge for 14 years, and a lawyer for 12 years, that the State had a "very strong case" "based upon the video- taped early statements on here, the confrontation call that was done, the letter that was attached to one of the motions [] that [Petitioner] wrote, statements that [Petitioner] made to the police officer where [Petitioner] attempted to minimize what had happened, but admitted that some things had happened, a jury will not believe any subsequent recantations, if in fact there is even a recantation when the case comes to trial." (Ex. 54, Settlement Conference Transcript, 8/26/19, pp 3, 5-6.) The judge also explained that, if there were recantations, that the jury would hear the reasons for the recantations. (*Id.*, p. 6.)

Counsel testified that he reviewed a declaration from Sheila Farrall that victim Bobbie Jo was diagnosed as paranoid schizophrenic before the age of ten, which was evidence that was "new to him" and would be "something that needs to be examined," although sometimes this kind of "stuff" is a double-edged sword, because a prosecutor could argue that there was an exploitation of these problems, *ie*., this would make it more likely that Petitioner would take advantage of her. (Tr. 9/22/2009, p.190-91)

The prosecutor in the case confirmed that research shows that offenders will target kids that, because of their mental illness, drug issues, prior history of allegations of sexual abuse, or running away, would not be believed if they told on the offender. (Tr. 9/23/2009, p. 12-13.)

### 2. Magistrate Judge's findings and recommendation

The Magistrate Judge finds that Petitioner makes no showing that either counsel's preparation and investigation in this case, or his advice to take the plea agreements was deficient. Petitioner has failed to support his claims that substantial evidence exists suggesting Petitioner's innocence, nor that absent counsel's alleged failures, he would have insisted on going to trial.

No evidence was demonstrated, either in the records, the exhibits, or through the testimony of witnesses at the evidentiary hearing, that Petitioner was innocent of the

crimes for which he was charged. The only evidence presented suggests that the victims may have attempted, at one time, to recant their allegations. This is not evidence of innocence. There is ample evidence suggesting that these attempts to recant were a result of pressure exerted by Petitioner and Petitioner's ex-girlfriend. Durina did not recant, even at the evidentiary hearing, and never testified that she would have recanted. Furthermore, Durina did testify that it was never her intention to say he did not do the things she alleged to the police. Durina demonstrated, both during the interviews given to Detective Laird at the time, and her testimony in court at the evidentiary hearing, that she felt that Petitioner's punishment was excessive, and that he had not "really hurt her." Despite her inability to remember that Petitioner had sexually abused her, she was unwilling to deny that Petitioner had done things to her or that she lied at the time to the police. Her testimony at the evidentiary hearing was very much in line with her previous statements that Petitioner had in fact done those things which she alleged to the police, but that, out of sympathy to Petitioner, she believed he was being punished too harshly.

There was no evidence presented that Petitioner was innocent of the charges involving Bobbie Jo. Bobbie Jo did not recant her allegations, and any attempt to recant was, again, at the behest of Petitioner and Petitioner's girlfriend. Although there was evidence of a previous recantation by Bobbie Jo when she was young, and some evidence that she had lied to the police about another incident, there was no evidence that Petitioner was innocent of the charges at issue in this case. In fact, the evidence that Bobbie Jo had previously recanted was also highly suggestive that Petitioner had been sexually abusing Bobbie Jo for an extended period of time. The evidence in the reports explained that, after examination, the psychologist assigned to interview Bobbie Jo believed that the original allegation was reasonable, consistent and accurate, and that Bobbie Jo, age 9 at the time, was recanting in order to return home. The evidence that

she lied to the police about Rachel Morgan, while raising issues about Bobbie Jo's credibility, does not demonstrate Petitioner's innocence.

The Magistrate Judge concludes that counsel's preparations were thorough and his advice sound. Counsel was aware of prior recantations by Bobbie Jo and of the potential recantations in the present case. Counsel was also aware of the possible reasons for those recantations, and the judge's opinion that a jury would hear those reasons. Counsel was acutely aware that the plea offer had already been extended, but that he could not rely on further extensions to continue his investigation. It is extremely unlikely that counsel would have changed his recommendation as to the plea even if he had been aware of all of the evidence presented by Petitioner at the evidentiary hearing (including the CPS or DES records or the police reports regarding Rachel Morgan, the testimony of Frank West, Gary Secore, Van Camp or Auzerae Patty, or the suggestion that Bobbie Jo had been diagnosed as a paranoid schizophrenic) because it is extremely unlikely that this evidence would have changed the outcome of a trial. Certainly it may have called into question Bobbie Jo's credibility; the credible evidence against Petitioner however, especially as it pertained to the four counts involving Durina, would have been very damaging to Petitioner.

> [T]he decision to plead guilty before the evidence is in frequently involves the making of difficult judgments. All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court. Even then the truth will often be in dispute. In the face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case. Counsel must predict how the facts, as he understands them, would be viewed by a court. If proved, would those facts convince a judge or jury of the defendant's guilt? ... Questions like these cannot be answered with certitude; yet a decision to plead guilty must necessarily rest upon counsel's answers, uncertain as they may be.

*McMann v. Richardson*, 397 U.S. 759, 769-70 (1970).

The Magistrate Judge further finds, as to Ground Two of the Petition (or the second claim of the motion for evidentiary hearing), that Petitioner has failed to support his factual assertion that his acceptance of the plea agreement was the result of

counsel's coercive and threatening behavior. The trial court, after erroneously stating that transcripts had previously been prepared, when in fact only one hearing had been transcripts (*See* Doc. No. 67, p.25, n.1), denied this claim in Petitioner's petition for post-conviction relief in state court, noting that none of Petitioner's claims were supported by competent evidence, Petitioner offered nothing but conclusory allegations and failed to present a colorable claim. (Doc. No. 62, Ex. 6, attachment to Petition for Review, M.E. 9/6/01.) The State appellate courts summarily denied review.

The trial court's finding was not an unreasonable application of *Strickland*. The Magistrate Judge agrees with Respondents assertion that the trial court's error regarding the available transcripts does not undermine the soundness of its ruling. Petitioner was able to notify the state court of the material facts germane to his claim without the assistance of transcripts. In fact, the most pertinent evidence relied upon by Petitioner, his recollection of counsel's behavior when they took a break during the settlement conference, was not in the transcripts. Further, the evidentiary hearing before this Court provided Petitioner with an opportunity to further supplement his claim. Witnesses present at the settlement conference describe counsel as shaking his finger and a piece of paper at Petitioner, telling Petitioner that if he didn't plead guilty he would never have a life or hope of getting out, that he was aggressive, and either angry or just in a hurry. No witnesses testified that the events occurred as Petitioner described them, and, in fact, Petitioner's father testified that the verbal abuse was directed from Petitioner towards counsel, not the other way around, despite previously having signed an affidavit recounting the events exactly as described by Petitioner. (Doc. No. 62, Ex. 7.) Ward testified that he was floored and distraught, not over counsel's behavior, but at the accusations against Petitioner and the possible sentencing range. Petitioner testified that he wanted to withdraw from the plea, not because it was bad advice or because he felt threatened or coreced at the time, but that his counsel had "done [him] wrong" by helping him switch the plea bargain." Ward testified that, had it been him, faced with

the assessment of the case as presented by counsel (notably, not because of his threatening behavior), he would have accepted the plea bargain.

Petitioner changed his plea in open court and stated that he had not been coerced into changing his plea. He did not advise the trial court that he was accepting the plea because he had been coerced. A defendant's "[s]olemn declaration in open court carr[ies] a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1976). "The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Id.* at 74.

Petitioner has failed to demonstrate that counsel acted unreasonably or that the advice of counsel was not within the range of competence demanded of attorneys in criminal cases. *McMann*, 397 U.S. at 771; *accord*, *Strickland*, 466 U.S. at 687.

Petitioner is also unable to demonstrate that he would not have pleaded guilty and would have insisted on going to trial but for counsel's coercion. This Court has reviewed the transcripts from Petitioner's motion to withdraw, and agrees with Respondent's characterization that his statements at the hearing "evinced a simple desire for less prison time; Petitioner was not committed to taking the matter to trial." (Doc. No. 57, p. 29.) This characterization is supported by witnesses Van Camp, who testified that after thinking about it Petitioner told him he would rather have gone to trial, and Ward, who was present when counsel advised Petitioner, testifying that he also advised Petitioner to take the plea.

G.      Ground Three: Plea Agreement is Facially Void

Petitioner argues in Ground Three of his Petition that changes made to his plea agreement after he signed it violate Rule 11(e) of the Federal Rules of Criminal Procedure, and that the plea agreement had already expired by the time he signed it. (Petition, p.7) Petitioner elaborates on this claim in his motion for evidentiary hearing, arguing that because the plea agreements were expired as of the date of signing, the

sentences imposed are of no legal force. (Doc. No. 52, p. 15.) Additionally, Petitioner argues that by changing the pleas after he signed the agreement, the prosecution and the court denied him the benefit of his bargain; the plea agreements signed by Petitioner could not have subjected Petitioner to 25 years in prison. (Doc. No. 52, p. 15-16.)

Although Petitioner raised this ground in the State courts, at no time did he notify the State courts that he was raising a federal constitutional claim. In fact, in presenting his motion to withdraw, Petitioner stated in open court that the sentence was never changed, only the counts. (Ex. 55, p. 8.) Petitioner has failed to satisfy the fair presentation and the exhaustion requirements. *See* 28 U.S.C. § 2254(b)(1)(A); *see also Baldwin*, 541 U.S. at 29; *Carey v. Saffold*, 536 U.S. 214, 219-20 (2002); *McFadden*, 399 U.S. at 998.

Even if Petitioner had raised the claim he now makes in his petition in the State courts, this Court could not grant relief. Petitioner asserts that the change in the plea agreement was a violation of federal rules. This claim is not cognizable because the Federal Rules of Criminal Procedure do not apply to Petitioner in his state court proceedings. *See* Fed.R.Crim.P. 1(a)(1). Neither has Petitioner raised a cognizable federal claim by asserting that the plea agreement was signed after it expired, and is contractually invalid.

Moreover, habeas relief is precluded because the alterations to the plea agreements were made before they were accepted by the court, (Ex. 54, p. 14) and a petition may not raise independent claims relating to the deprivation of constitutional rights that occurred prior of the entry of a guilty plea. *See Tollet v. Henderson*, 411 U.S. 258, 266-67 (1973). A guilty plea forecloses all collateral attack not related to the knowing and voluntary nature of the plea. *See Henderson*, 411 U.S. at 266-67 ("a guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise

independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann*.")

Accordingly, the Magistrate Judge recommends that Ground Three of the Petition be dismissed for failure to present a cognizable claim, and for failure to exhaust.

G.    <u>Ground Four: Suppression of Evidence by the State:  Exhaustion</u>

Petitioner contends that the State violated Petitioner's constitutional rights by suppressing evidence that would have acquitted Petitioner. (Petition, p. 8.) Petitioner states that the facts supporting this claim are that, two days after Petitioner prevailed in his motion requesting access to DES and CPS records of the victims, the Court accepted his plea, and no records were ever received from CPS or DES.  (Petition, p. 8.)

This claim is presented for the first time in this Petition.  Accordingly, Petitioner has failed to satisfy the fair presentation and the exhaustion requirements. *See* 28 U.S.C. § 2254(b)(1)(A); *see also Baldwin*, 541 U.S. at 29; *Carey v. Saffold*, 536 U.S. 214, 219-20 (2002); *McFadden*, 399 U.S. at 998.  Petitioner's right to direct review having been completed, he would have to present this claim in an additional petition for post-conviction relief in order to exhaust the claim. Under Arizona law, a defendant convicted pursuant to a plea agreement must file a notice of post-conviction relief within ninety days of the entry of judgment and sentence or within thirty days after the issuance of the final order or mandate by the appellate court in the petitioner's first petition for post-conviction relief proceeding.  32.4(a), Ariz.R.Crim.P. Petitioner has already completed his first Rule 32 proceeding.  If Petitioner were to fairly present this issue in another petition for post-conviction relief, such presentation would be untimely. Moreover, this claim does not qualify for any of the timeliness exceptions.  Rules 32.1 and 32.4(a), Ariz.R.Crim.P.  Such a new petition, therefore, would be subject to

summary dismissal. *State v. Rosario*, 195 Ariz. 264, 266 (App.1999); *State v. Jones*, 182 Ariz. 432 (App.1995); *Moreno v. Gonzales*, 192 Ariz. 131, 135 (1998) (timeliness is a separate inquiry from preclusion). Moreover, Petitioner would be precluded from raising this claim in another petition for post-conviction relief. Rule 32.2(a), Ariz.R.Crim.P. This claim, therefore, is procedurally defaulted. *Park v. California*, 202 F.3d 1146, 1150-51 (9th Cir.2000) (federal habeas review is precluded where prisoner has not raised his claim in the state courts and the time for doing so has expired). Accordingly, federal habeas review of Ground Three of the Petition is barred absent a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Dretke v. Haley*, 541 U.S. 386, 393-94 (2004); *Carrier*, 477 U.S. at 488. The Magistrate Judge finds that no showing of cause and prejudice or a fundamental miscarriage of justice has been made.

Furthermore, the Magistrate Judge agrees with respondent's contention that this claim, which addresses alleged constitutional defects that occurred before the plea agreement was accepted by the state court, is foreclosed by Petitioner's guilty plea. *See Henderson*, 411 U.S. at 266-67.

Accordingly, the Magistrate Judge recommends that Ground Four of the Petition be dismissed for failure to present a cognizable claim, and for failure to exhaust.

G.    Judicial involvement in the plea colloquy was coercive, constituting a deprivation of due process.

This claim is raised in this federal habeas for the first time in Petitioner's motion for evidentiary hearing. Arguments not raised in the Petition are deemed waived. *See Delgadillo v. Woodford*, 527 F.3d 919 (9th Cir. 2008) ("Arguments raised for the first time in petitioner's reply brief are deemed waived.")(citation omitted).

**RECOMMENDATION**

This Court recommends that the District Court dismiss this action in its entirety.

1    Pursuant to 28 U.S.C. § 636, any party may serve and file written objections
2 within 14 days of being served with a copy of this Report and Recommendation.  If
3 objections are not timely filed, they may be deemed waived.  If objections are filed the
4 parties should use the following case number: **CIV 04-0260-PHX-EHC**.

5    The Clerk is directed to deliver a copy of this Report and Recommendation to
6 Petitioner and Respondents.

7    DATED this 19th day of February, 2010.

8

9

10

11

12    _____
                    Bernardo P. Velasco
13              United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28